Good morning, your honors. May it please the court, my name is Ben Luckett and I represent the petitioners. The Atlantic Coast Pipeline would cut a 125-foot wide swath for over 300 miles through Virginia, clearing more than 3,000 acres of forests, crossing nearly 1,000 streams, including over 100 sensitive trout streams. Much of the terrain crossed is steep and highly erodible. Now this case comes down to whether the Virginia Department of Environmental Quality and the State Water Quality Board rationally concluded, based on the evidence before them, that that construction would not lead to a violation of Virginia's water quality standards. A petitioner has put before the state agencies overwhelming evidence, much of it from Atlantic's own experts, that the combined impacts of the pipeline, particularly the project's discharges of sediment, would harm aquatic life and otherwise significantly lower water quality. The state agencies failed to seriously grapple with that evidence and instead based their certification on unreasonable, untested assumptions. The agencies reached a conclusion that's contrary to the evidence before them and they failed to show their work. Now as I'll explain in more detail, this challenge is distinct and based on a different record than the previous challenge to the certification of the Mountain Valley Pipeline. In contrast to that challenge, petitioners here have focused on the agency's failure to consider the combined impacts of numerous stream and wetland crossings in individual watersheds, including impacts on the Chesapeake Bay. Further, this challenge highlights the agency's failure to adequately consider impacts to fragile, karst terrain. Now prior to the State Board did reopen on that adequacy part of the Nationwide Permit, which the Section 401 certification relied on. So do we have anything further from that? I mean do we have jurisdiction if they've done that? Yes, Judge, the state agencies reaffirmed their prior certification of Nationwide Permit 12, but that certification alone is not sufficient to establish that this project as a whole will not cause violations of water quality standards. Now prior to this certification, a pipeline of this size had never been constructed through the steep and highly erodible terrain of Virginia's mountains. But since that time, on the ground experience with both this pipeline in West Virginia and the Mountain Valley Pipeline for which the review process was almost identical and for which the conditions regulating the ground experience has revealed that water quality impacts are substantial. Mile-long stretches of streams have been buried in sediment up to a foot deep as a result of the inadequacy of the project's erosion and sediment controls. Is this an accumulation argument you're making in terms of the impact here? Your Honor, I'm talking about what we have seen on the ground from the actual construction of a project very similar to the Atlantic Coast Pipeline where the state agencies, just as they did in this case, promised the court and promised the public that the measures they were imposing would protect water quality. And what we've seen is that that's simply not true. These state agencies have asked the court to accept that these measures they're relying on are tried and true. But what we've seen on the ground is that these measures have been tried and they fail spectacularly and repeatedly. Now, the evidence demonstrating the unreasonableness of the state agency's predictions should not be ignored. As the D.C. Circuit explained in Amico Oil v. EPA, by the time judicial review is secured, events may progress sufficiently to indicate the truth or falsehood of an agency's predictions. A court need not blind itself to such events. A contrary rule would convert the reviewing process into an artificial game. So we've seen already that the promises that the state agencies have made are hollow. Now, at the outset, it's important to understand exactly what the agencies have certified here. EPA's regulation governing Section 401 certifications requires a state to have a reasonable assurance that the activity will be conducted in a manner that does not violate water quality standards. Water quality standards consist of uses of the water bodies and the criteria necessary to protect those uses, which can be either numeric or narrative. Now, Virginia does not have a numeric water quality criterion for sediment, but they do have a directly applicable narrative criterion. And that states that criterion prohibits substances in concentrations, amounts, or combinations which are harmful to human, animal, plant, or aquatic life. And those substances specifically include turbidity-causing pollutants, such as sediment. So what the state agencies have certified here is that construction of this pipeline as a whole will not lead to harmful concentrations of sediment in any of the Commonwealth's waters at any time. And the state simply lacked a rational basis for that conclusion. Indeed, the state agencies recently admitted that they have not developed methods to determine compliance with that narrative water quality standard. Is that evidence that was developed after this certification? That's correct, Your Honor. And that's why I cited the D.C. Circuit case earlier that despite such events, where events prior to the end of judicial review, but after the agency decision occurred, where events take place that tend to disprove, show the truth or falsehood of an agency's predictions, the court should not ignore that evidence. So you're saying we should invalidate the certification based on evidence that comes after the certification? I think that's certainly reasonable to consider that evidence as part of the court's consideration of whether the agency's predictions were reasonable. But that evidence, the court need not rely on that evidence to conclude that those predictions were not reasonable and were not based on the evidence in the record. Do we know whether or not the board had a copy of this hydrogeological assessment that is at JA 871 prepared by Pamela Dodds? Have you seen that? I believe that was submitted to the board, yes, as part of the comments on the pipeline. But even beyond that, Atlantic's own expert... Was any of that evidence in this record? What came after the certification? Yes, that is part of this... This hydrological report that I'm looking at is in our joint appendix at 871 and seems to say... It doesn't sound good for the assessment here, but I guess I'll ask the board about it. It does not at all. And that was evidence submitted by petitioners here in their comments to the board. But even Atlantic's own evidence shows that there would be substantial sedimentation impacts. In an analysis they performed for the Forest Service, that predicted a 200 to 800 percent increase in sedimentation, which would last for years. And that was assuming the same types of erosion and sediment controls that the state agencies have relied on here to determine that there will be no adverse impacts to water quality. And indeed, the Forest Service even criticized that estimate as painting far too rosy of a picture. There, the company assumed that their controls would be 96 percent effective. And the Forest Service said that at most they should consider them to be 55 percent effective. So in reality, that model showed that there was likely to be even greater than a 200 to 800 percent increase in sedimentation. Atlantic performed another analysis for a watershed in Bath County, Virginia. It showed erosion increases of between 227 and 246 times pre-construction levels. Another assessment submitted by petitioners showed a 9,000 percent increase of sedimentation in one steep slope watershed during the time of construction, and a 300 percent increase permanently. And that was assuming 75 percent effectiveness of erosion controls. How much of this has already been decided by this board in this previous decision, sir? These same analyses were not before the court in the Mountain Valley decision. Again, this is a distinct record from that case. And these increases that are predicted, again, by Atlantic's own experts would have serious implications, cause serious harm to aquatic life. And indeed, this court recognized in its recent case vacating the incidental tape statement under the Endangered Species Act for this very pipeline, that sedimentation from the pipeline would harm multiple endangered species of aquatic life, including the rowan oak log perch, the club-shell mussel, and the Madison cave isopod. And again, the state agencies simply never grappled with all this adverse evidence in the record. Again, they simply asked the court to rely on their unsupported assumptions about the effectiveness of the measures that they have opposed. Again, which are nearly identical to the measures that were imposed on the Mountain Valley pipeline on which we have seen substantial sedimentation impacts in real life. Because the agencies haven't shown their work, their conclusion is not due any deference. The court cannot defer to avoid. State agencies' conclusion that they could prevent any harm to aquatic life is particularly troublesome in regards to watersheds that would be crossed numerous times by the pipeline and its access road. And this is a claim that was not raised in the Mountain Valley pipeline case. Each crossing involves not just the direct impacts to the stream bottom, but you have often very steep slopes that again, you're going to have a 125 foot wide swath cut down to bare soil, leading down to these stream crossings. And in some watersheds, there are numerous crossings in short distances, and the states never considered how these numerous crossings would combine to impact water quality. A particular example is the Calf Pasture River watershed, which includes a remarkable 71 crossings in that one watershed alone. In Townshend Draft Watershed in the George Washington National Forest, which is a sensitive wild trout stream, contains nine crossings over a half mile stretch. A declaration submitted by an expert PhD biologist along with plaintiff's stay motion, predicted that sedimentation increases were likely to lead to the permanent extinction of that wild trout population. The state simply never grappled with how these sediments would combine to impact water quality. All they said is that they weren't expressly required to consider it. But they weren't, because Section 401 requires them to determine whether the activity will be able to be completed in compliance with water quality standards. I just have one more question about this hydrogeological assessment by Dr. Dodds. Who did Dr. Dodds prepare this assessment for? That was prepared for, she, I know that she did work for... It says the Dominion Pipeline Monitoring Coalition. Who is that? That is an independent, that is a citizen group, and so that was prepared and submitted. She also, I believe, submitted reports on behalf of another group. But now one watershed in which these combined effects would be felt particularly harshly is the Chesapeake Bay. That watershed contains more than 800 water body crossings here. The bay has long suffered from too much sediment and other pollutions, which has resulted in a multi-state, multi-million dollar effort to try to return the bay to compliance with the water quality standards. That's called a Total Maximum Daily Load, or a TMDL. In the TMDL, a state looks at what's causing the water quality standards violations, how can those be remedied, how much pollution can the water body accept. So there's a detailed plan out here about compliance with water quality standards in the Chesapeake Bay. Despite this project, including over 800 crossings within that watershed, the state agencies never consulted that plan when determining whether this project would lead to a violation of water quality standards. They thus failed to consider an important aspect of the problem. Now finally, an additional claim that is distinct from what was raised in the Mountain Valley Pipeline Challenge is that the state agencies failed to assess the impacts, failed to adequately assess the fragile karst areas, which are areas with limestone bedrock where water dissolves the rock and there are many underground connected passageways where often what would be a surface stream instead is flowing underground. And these areas are very fragile and subject to harm from activities like pipeline construction. Again, you focus on how much more the state agencies could have done in this case, but really when we're looking at these cases here in terms of the agency, our view is much more limited. We're looking for sufficient evidence in which we can rely upon, the state agencies can rely upon for reasonable assurance. So they allow for reports to be in progress, documented. That's what was said in the Sierra Club case. And now, but to hold them to things that are prospective to happen, it seems to me it goes beyond what our view goes to when we're dealing with state agencies. You said we're not, they're not entitled to a deference because you didn't have the report, I guess. But, or they hadn't got, developed all the evidence. But that's kind of what was said in the Sierra Club. Your Honor, the agency had to make a rational conclusion based on, between the facts found and the conclusion, rational connection between the facts found and the conclusion reached. Here the facts in the record were that there would be substantial increases in sedimentation, even with the imposition of the exact types of sediment control devices. Again, even assuming an unreasonable amount of effectiveness of those erosion and sediment control devices, which is what the Forest Service said. And then that it was simply unreasonable for the There is no specific analysis in the record that counters all of those analysis, indeed many of which were performed by Atlantic itself, to show that this project could comply with water quality standards. And again, that is the determination that the state reached, that this project would be constructed without leading to violations of water quality standards. The evidence before them did not support that determination. And as we've seen on the ground, that determination was unreasonable, because construction of similar projects and construction of this project in West Virginia have already led to substantial violations of water quality standards. Thank you. Mr. Hayden. Good morning, Your Honors, and may it please the Court. Toby Hytens on behalf of the State Respondents. In our view, the legal issues in this case are largely controlled by Sierra Club, involve matters that fall near the heart of agency expertise and judicial deference to agency conclusions. Tell us what's controlled by Sierra Club, in case we just dish it. Absolutely, certainly, Your Honor. Well, the council had a different view on that. Yes, Your Honor. So, to get at what I think is controlled by Sierra Club, I think the standing issue that we raised is resolved by Sierra Club, and we are not asking this Court to revisit that holding. We think that on both the cumulative impacts and the anti-degradation points, substantial portions of the petitioner's claims are foreclosed by Sierra Club. So, on cumulative impacts, I think this Court in Sierra Club accepted the state agency's argument and rejected the petitioner's argument about which certification is before the Court. Sierra Club says only the later certification is properly subject to judicial review at this point. I think that Sierra Club on cumulative impacts also resolves in our favor the fact that the state agencies are allowed to incorporate and build off the analysis of federal regulators and are not required to retell the same ground that was gone over in the federal regulatory process. So, it fully integrates those earlier documents, including many of the same documents we're dealing with right here in Sierra Club. That's correct, Your Honor. And in Sierra Club, this Court upheld the state agency's determination in part based on their incorporation of the federal documents, and we think that On anti-degradation, I think there are two pieces of it that are resolved by Sierra Club. In Sierra Club and in the briefing in this case, I understood our friends on the other side to argue that if any additional material gets into the water, that constitutes degradation as a matter of state law, and I understand Sierra Club to have rejected that argument and deferred to the state agency's construction of their regulations about what anti-degradation means. The other major point that I think is all but conclusive on anti-degradation here is that I read Sierra Club to expressly hold that the state agencies did not abuse their discretion or exceed their authority by incorporating into their annual standards and specifications the requirements of the Virginia Construction General Permit. I understand Sierra Club to have resolved that. Now, I acknowledge there are a number of factual differences in this case that are not on all fours with Sierra Club, and of course, the record in this case is somewhat different. But I think all of those things involve factual issues, disputes about the evidence in the record, how you would weigh the evidence in the record, whether you find this evidence more persuasive than that evidence, and I agree that that's a different record and it's before the agency, but I think when we're talking about facts in the record and predictions about what's going to happen in the real world, that is the heartland, that is the center of agency expertise. What about the, well, it is, but the question in terms of deference, we're looking at a situation in which certification here is conditioned. It's conditioned on several additional, I guess, studies that haven't even been done yet. I understand that it's conditional on compliance with certain requirements that had not been met at the time of the 401 survey. That's to determine, so how do we determine whether you are complying on things that are state water regulation? Judge, I understand the point. I guess what I would say is I think this is in part resolved by Sierra Club as well, and let me explain why. I understand there is some sense in which how can the court defer to things that are going to happen in the future, and that was one of the arguments that was raised by the petitioners in Sierra Club. Because in Sierra Club, part of the 401 certification included monitoring, and the argument was made by the petitioners that that can't be part of the reasonable assurances because the monitoring hasn't happened yet. And I read the court's opinion in Sierra Club to say that's not correct. Monitoring, the plan to look at things in the future and make adjustments if there are problems is, first of all, a standard regulatory technique. And second, it's a completely appropriate regulatory technique. So I think, Judge Winn, to your point, I think the question before this court, it is an important question, but I think it's a narrow question. It's whether in December of 2017 the state agencies were arbitrary and capricious in concluding that the measures they had put in place, including future monitoring and future certifications, were part of it. So my question is, this August 17, 2017 hydrogeological assessment that I asked about earlier, did the board have this and consider it or not? And should it have? Does it matter? Is it red herring? I'm just trying to figure out where this is. Well, Judge Becker, based on the dates, it appears to me, and I have no reason to believe that this wasn't before the board. I believe it was. And I'll, of course, will, of course, update the court if I have reason to believe that that's not true. But we are certainly willing to assume for purposes of today that it was before the board. And I had a look at it. This is in the nature of a factual submission on the part of a person who had a different view than the one the board ultimately took. And I think it's – I can't represent that the board specifically responded to this specific study. Now, in my understanding, that study was done before the board's final certification. Yes, Judge Wynn. That study is – So that's not the kind of thing we're talking about in terms of what I was talking about, is prospective documents. How do you do it through the certification when you know there are studies and things coming forward? It seems to be the point. Are they even in the record? So, Judge Wynn, based on the dates, the certification that Judge Becker asked about is dated August 17th, 2017. The certification that's being challenged in this case was issued on December 20th of 2017. So we're not talking about something that post-dates the certification here. This predates the certification. So to address – Well, what about the ones going – the condition ones, the one that didn't have there? Those are not in the record now, right? Judge Wynn, I want to make sure that I'm understanding and answering your – In other words, what – after December 17 type studies, there are none in the records now? Well, no. They would not be in the administrative record in this case. What I think you were going to say is that this study was in the record before the final certification was issued, and it was presented by – you took everything into account. This was an opposing view, and this counted it. That's my understanding, Judge. And, Judge Becker, I can't say that the board specifically responded to this specific study. What I was going to say was, in fairness to the board, they were presented with an enormous amount of information. I think the best evidence that they did not ignore the points that were made to them, I would direct the court to JA 982-1012, which is a whole series of responses by DEQ to comments that had been received by outside groups, including comments of this nature. Again, I can't say they specifically name-checked this specific study, but it is not the case that the board was presented with all of this information and then literally said nothing in response to it. There are I just want to be clear. I'm trying to understand the opposing argument. It seems like the part of the argument was this cumulative evidence and anti-degradation evidence arises from studies that are conditioned on here, additional studies, and arises from plans and things that are ongoing, even beyond December 7th of 2017. But my understanding from your response is the report that Judge Thacker said is in the record because it's before, but we don't have this information after that date, or do we? Well, again, Judge William, I would take, I think it's certainly unquestionably the case that anything that was after December 2017 is outside the administrative record. Now, our friends on the other side say there are certain circumstances in which courts can consider things outside the four corners of the administration. My question is, did you put it to us? How are we going to consider anything if you don't give us the evidence? Well, Judge Wynne, we're of the view that this court is reviewing the December 2017 certification, that nothing other than that is before this court right now. If there are concerns about things that happened after December 2017, there are mechanisms to raise those concerns. But with respect to the argument of our friends on the other side, a petition for review to this court is not the appropriate way to raise those things. Well, it does sound kind of, if you're going to condition on it, condition a study on it, do it on December 17th. Something comes up in February that is just horrible, we can't look at it and say that's not good? No, Judge Wynne, there is someone who can look at it, but this is not the proper procedure for someone to look at it. To the extent that the petitioners, and I heard again today, a discussion of evidence that has occurred far after this that is far away, if that is the case, and the proper mechanism to raise that is to raise that with the Department of Environmental Quality, who can raise it with the board, and if there are sufficient causes for concern, it can be referred to the Attorney General for an investigation that can include all sorts of remedies up to and potentially including a stopped work order. Our point is not that none of this matters, that none of this is a concern and none of this is something that someone should be able to look at, but it is our submission that a 401 certification petition for review is not the proper mechanism to raise that because this court, among other things, is not a fact finder, is not in a position to determine what the true facts are. This situation involves the administrative record that is before the court, and I think there is something that was highlighted in the first argument that helps illustrate that for me. There was a reference this morning, as there is a reference in the petitioner's opening and reply briefs to this study, that shows 9,051% and 319%, and I agree, those are stark numbers if you look at them, but if you look at the page of the joint appendix immediately preceding them, so those numbers are in a table that is contained on JA 938, but if you look at the very preceding page, JA 937, it says, the analysis performed for the construction scenario, which is the basis of the 9,051% number, assumes no best management practices were implemented, but of course that's not the case. The state agencies did not approve something that has a certification that has no best management practices, and so regardless of that specific point, I guess the more important fundamental point I'm raising here is that we're getting into some incredibly specific, detailed scientific studies. What is our job here then? I thought we were supposed to determine whether this agency action here complied with the state water quality regulation. Is that our job? I would suggest one respectful modification to that, Judge Wynn. I think that this court's role, it is an important role, but this court's role is deciding whether the board was arbitrary and capricious in concluding that this complied with state law. It is not this court's role. In December. So we are locked in December, right? Yes, sir. But then how do you do that? Then why put condition on anything? If you give a report in December that says it's condition on additional studies and these studies aren't even done, and to me that tells you what the report is. If it's condition on these additional studies, you're talking about water quality regulations. So if you don't have a study that pops up in February, March, and in March it shows, oh, no, absolutely not in compliance, well, it conditioned itself on that future study. But you're telling me we cannot consider that in looking at the December report because that's in February and because I guess you say Sierra Club tells me that, right? Well, Judge Wynn, I think I understand the impulse that arises under that, but I think the same point can be made with regard to a monitoring requirement. You would say, but how do I know... Answer that one. I want to know about that. Oh, well, Judge... If it's condition on, if you give me a report in December that says, okay, here's the report, but now this thing is conditioned on some additional studies that are going on out there, and, Judge, we want you to look to see if you're arbitrary, if we were arbitrary and capricious in doing this with regard to determining what the state water regulations are. Well, if I look at it in December, probably not, but you condition it on something coming forth, and then something comes forth, you're telling me I can't look at that and say, whoa, you conditioned us on this, and it turns out you were wrong. May I answer, Judge Gregory? Certainly. Certainly. So, Judge Wynn, yes, our bottom line is that does not prevent it from being a reasonable assurance that's subject to judicial review, and I think I understand the instinct, but I think it's with respect exactly the same as the argument that was made with respect to monitoring. The argument would be, how can you say monitoring is going to be preventing this if I don't know what the monitoring is going to show, and what do we do if the monitoring shows that it wasn't what we expected? That's a good question. Well, thank you, Judge Wynn, but I think this Court's decision in Sierra Club conclusively resolves that point in our favor, and I think the reasoning of that is the same as here. All right. The state agency has to make a reasonable assurance. That's a prediction based on the evidence they have, and they're allowed to consider the fact that they're going to continue to monitor and learn things as the evidence comes in. So is your position in terms of the predictability aspect, it has no dynamic at all. It's one of those things where you sort of have a snapshot. If the tools of predictability were reasonable and not arbitrary, then you're saying it is of no moment that three months later we find it absolutely tanks in terms of accuracy. Is that your position? That is not our view, no, Judge Gregory, if I could explain why. Please tell me where the gap is for judicial ability. That's key. Absolutely. So, Judge Gregory, I think our view is there's a distinction between what's before this and what the state agencies and potentially courts down the road could do in light of evidence that's discovered later. Our position and our view is that in this proceeding, the only question before this court was whether there was enough evidence before the state agency to have reasonable assurances in December 2017. That's a prediction, and that is a snapshot. I think this review is a snapshot. But that isn't to say that if evidence arises in the future, there aren't mechanisms to bring it before appropriate authorities who can take action if necessary. It's just about the limited, important, but limited nature of this particular judicial review proceeding. Thank you very much. Thank you. Mr. Smith. Thank you, Your Honors. May it please the Court, my name is Brooke Smith. I'm here on behalf of Intervenor Atlantic Coast Pipeline. Each of the issues that you've heard from Petitioner today are issues raised before the agencies before their important decision in December of 2017. What I'd like to do is attack and address each of those issues in terms of how they relate to or are distinct from your decision in the MVP 401 case. The first related to cumulative impacts, combined impacts of multiple crossings in individual watersheds. As this Court found in the MVP decision, the issue of cumulative impacts is addressed first and foremost by the federal agencies with purview over this project. FERC, which did an extensive cumulative impact analysis as part of its NEPA review, and the U.S. Army Corps of Engineers, which similarly did an extensive cumulative impact analysis in connection with the issuance of its nationwide permits. It was not neglected by the state agencies, however. Just as the Court found in the MVP decision, the state agencies relied on the records established by those federal agencies and indeed used this type of information on cumulative impacts or excess sedimentation or harsh concerns as the catalyst for the so-called analytical gap, wherein the state identified that its 401 certification of the nationwide 12 permit might not cover all potential water quality impacts associated with this project and thus initiated what we now have before us as the Upland 401 certification from December of 2017. It is through that Upland 401 that the state imposed additional conditions to provide additional reasonable assurance to ground those other decisions on which it relied. What is that certification in December 17 we've been talking about? Is it in fact conditioned on additional studies, compliance with additional studies, on incomplete type plans and things that are going to happen to? Your Honor, there's one material difference on the face of the 401s. There is a springing effectiveness condition in the ACP 401 in Section 3, which says that the 401 certification shall not become effective until after the review and approval as required by law, by DEQ, of a handful of plans, the CARST plan, annual standards and specifications, erosion and sediment control plans, and stormwater management plans. We would respectfully submit that that makes the ACP 401 even more stringent than the MVP 401. It will not become effective until these additional conditions and they were done in December of 2017? Some are still in process, Your Honor. So was it effective in December 2017? I might be asking questions that are kind of outside, but I'm trying to understand what we've got here. It's a funny animal we're working with here. Yes, Your Honor. It's a moving target, but we're talking about water quality regulation. I kind of want to know what the water quality is of something when we're doing these kinds of things. So maybe most people do too, but you're telling me most of them were done in December 2017. Others were done later, but the certification did not become effective until the remaining ones were completed? Your Honor, your concern is precisely the state's concern. So the state took final action to issue the 401 certification with a deferred effectiveness condition that said this certification shall not take effect. No construction shall occur in Virginia and, indeed, has not occurred in Virginia until these approvals are in hand and have been vetted by DEQ and reported to the public in the book. Do we get to consider that additional information before the effectiveness of it insofar as the December 17th? Are we locked into what's on December 17th? Your Honor, this is precisely the circumstance you face in the MVP case as well, and, indeed, footnote 14 on page 41 of the opinion. So the answer is? You have before you a record of decision by the state agencies that culminated in the final agency action on December 20th of 2017. So 17 is where we're locked, December 17th, even though the effectiveness of it is preconditioned upon these studies and things that are ongoing here. We can't look at that. No, Your Honor. Let me allay your concern, though. The purpose of the required approvals is to give the state agencies, as the delegated agencies under the Clean Water Act, the purview to critically review and assess and determine the efficacy of those plans. And the certification will not take effect, cannot take effect until that has occurred. Who reviews them? The state agencies. I thought we. But if you don't like what the state agencies are doing, who reviews them? Well, again, Your Honor, the conditional plans aren't even part of the required 401. These are discretionary. Not even in the record, right? Some are in the record. The annual standards and specifications is a perfect example, and that's especially appropriate for the issues before this Court because the annual standards and specifications require additional measures to address the things that the petitioners are concerned about, including impacts in karst terrain and impacts on the Chesapeake Bay watershed. Similarly, it is the framework that the state has. This is to establish reasonable assurance that water quality standards will be protected. There are two critical mechanisms for that reasonable assurance. One is the approval of those plans that go into the additional detail of each and every construction spread over the course of the Commonwealth of Virginia. The other is the water quality monitoring. Just as this Court found significant in the MVP decision, the state has water quality monitoring that is real-time. Turbidity will be collected every five minutes. It will be available to the public in one hour. The principal purpose of which is to allow the state agencies as the responsible agencies to take action if there is a concern in the field. And, indeed, the state has new legislation out of the 2018 General Assembly session that gives them stop work authority. If there are concerns about the implementation of these certification conditions in the field during construction, the state is the agency with the responsibility to oversee and protect water quality standards in the Commonwealth. So the petitioners can never come to this Court in this type of case. Usually, I would think in this instance, with a fully developed composite of data that is used in this process, because some of it is ongoing after December 17, you still have things going on. So I'm not following that. I mean, it seems to me they would have the benefit of it because it's ongoing. It's almost like you're saying, well, trust the state agencies. They're going to do what they're supposed to do. But we had enough in December 17 to proceed. Chief Justice Gregory, I see that I'm out of time. May I respond? Yes. Judge Wynn. I hope he does become Chief Justice, too. There were 15,000 comments submitted in the record leading up to the state agency's decision. Each and every one of the issues before you today was raised as part of that process. There was evidence presented on each of those issues. There is always an opportunity to gather more information. We will never be complete in our understanding of the impacts or the consequences of any given action. The question is whether the state properly designed a certification that actually gives reasonable assurance that water quality will be protected. Thank you for that answer. Thank you, counsel. Mr. Luckett, you have some time. Now, the state and Atlantic have argued that any combined impacts were assessed by FERC in the EIS, which the state here considered. But that's simply not true. Here what petitioners are talking about is the combined effects of multiple crossings within a waterway on that waterway's health. These are each going to add sediment in each specific instance that will combine to have greater effects. Now, that's something that EPA recommended that FERC consider in its EIS, but FERC did not do that. Furthermore, FERC's analysis and the Army Corps' analysis do not make the finding that is critical to the agency certification here. Neither of those agencies said that this project will comply with state water quality standards. Indeed, both deferred that question to the state. The state is setting up this circular mechanism whereby FERC relies on the state to make a water quality standards determination, and then the state turns around and relies on FERC for that same evidence. So the type of cumulative analysis that FERC purported to do, that is different from what we're talking about here, is whether the state considered that these multiple discharges in smaller watersheds combined would not lead to water quality standards violations. What we've seen, again, is that the evidence that was in the record at the time, December 2017, that the state made this determination simply did not support that conclusion. The state says that they responded to these concerns in their responses to comments, but they never addressed these models, Atlantic's own models that predicted a 200 to 800 percent increase in sedimentation. And again, which prediction the United States Forest Service said was unreasonably optimistic. They had before them, at the time they made this decision, substantial evidence showing that exactly what we've seen on the Mountain Valley Pipeline, that that's what was going to happen. These post-certifications events that we've seen, the harm to water quality, these should not have been a surprise, because that is what the models before the agencies predicted. And in their responses to comments, the state merely said that they disagree with the statements, but they never did any analysis of their own to counter these predictions. That's not the type of analysis that the court can defer to. If the state said, well, we disagree with the results of that model, here's what our model that we apply our expertise to make predictions, here's what it says, that's the sort of reason choice that courts should properly defer to an agency's expertise. It sounds good, but isn't much of what you were saying been already decided in the Sierra Club case? No, Your Honor. Again, these are separate studies from what were available to the court in Sierra Club, and the issue of multiple combated impacts. You're talking about the factual differences of the studies. I'm talking about the law. What the court in Sierra Club said is that the state did consider the combined impacts of discharges from upland areas and the stream crossings themselves. That was the claimant issue in Sierra Club, was could the state perform these separate reviews? And the court said, yes, they could, and that they did consider all these things together. But the court never said that the state there considered the combined impacts of multiple crossings in a single watershed like is at issue here. And further, the state now says that we can rely on their monitoring efforts to determine that there will be no harm to water quality. But that's not sufficient. Now, they characterize this real-time monitoring as if it applied to the entire pipeline route. That was done in Sierra, too, the monitoring. Same question. Yes, Your Honor, and I think on that particular question, that's where we can look, as the D.C. Circuit directed, we can look to this post-certification evidence that show, well, the court may have thought that reasonable at the time. This post-certification evidence shows that that's most certainly unreasonable. All of these numerous incidents that we've seen with pipeline construction under these almost identical conditions, and what are imposed on this. And the post-certification evidence is in the record. That has been submitted to the court as part of the petitioner's stay motion, yes. And those were the problems there on the Mountain Valley Pipeline were not identified as a result of the state's monitoring efforts. Those were identified as a result of citizen complaints. And furthermore, the state recently expressed in a hearing, which we submitted an excerpt of the record, as part of a Rule 28J letter, that as part of their monitoring, they don't know how and do not intend to monitor for compliance with the narrative water quality standard, which is the only water quality standard that protects aquatic life and human health from sedimentation. They said, this is the only standard that applies. We don't even know how you would calculate that to assess compliance with it, which fundamentally undermines their determination that this project can be completed in compliance with water quality standards. Thank you. Thank you. Thank you. We'll ask the clerk to have a brief recess, and then we'll come down and re-counsel. This honorable court will take a brief recess.
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker